[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff-wife commenced this action against the defendant-husband seeking a dissolution of the parties' marriage on the grounds of irretrievable breakdown. The defendant filed an answer and cross-complaint wherein he likewise alleged irretrievable breakdown and he sought a dissolution and other relief He thereafter amended his pleading to allege a second count seeking equitable relief — specifically, alimony. At trial, she was forty-eight (48) years old and he was forty-five (45).
The parties met in New York City when the plaintiff responded to the CT Page 3132-bp defendant's personal ad. She had, ten years earlier, been married briefly; he had never married. She was then employed as a personnel manager at Citibank, had a master's degree in Industrial Psychology, and owned a co-op and furnishings. He was unemployed and also owned a co-op and some furnishings. Neither had much cash or other savings. She was aware he had a serious alcohol problem; in fact she encouraged him to enter a residential treatment program at Hazleton in Minnesota, a program he successfully completed. She also learned that, prior to their meeting, he had sometimes used the services of prostitutes. They nevertheless fell in love and five (5) years later, on May 19, 1990, they married. He had by then become employed as a manager of a risk arbitrage department at a securities firm; their combined income in 1990 was $70,251, of which she earned approximately $54,000 (Plaintiff's Exhibit B). Yet, he was mostly unemployed for the first two (2) years of their marriage; she supported them on her slowly but steadily increasing salary at Citibank. She contributed $20,000 of her money toward an effort he made to establish a hedge fund that proved unsuccessful and he was again unemployed. In 1992, he was again employed in risk arbitrage and, believing his income was secure, they purchased their first home in Westport, CT, for $423,000.
The plaintiff withdrew $31,000 from her 401K and borrowed $100,000 from her mother to purchase the home. During periods of his unemployment, she paid the monthly mortgage of approximately $2,500 and otherwise supported them. By 1997, their financial fortune had changed. He had been employed by Omega Advisers, Inc. for three to four (3-4) years and they were experiencing financial stability for the first time in their relationship. In June of that year, they sold the Westport house at a profit of $100,000 and rolled $200,000 from monies received at the closing into the purchase of a large, ten room house at 3233 North Street in Fairfield, CT. The plaintiff described the marriage through the end of 1997 as very happy despite the early and frequent money problems. Their sex life was, she said, "terrific" and they had the money to vacation abroad and to spend considerable sums on such acquisitions as a pool table and pinball machine and a 1997 Maserati for the husband. Within a year of their move to Fairfield, they had become very good friends with their next door neighbors. By the end of 1998, however, the marriage had significantly deteriorated — much to the plaintiff's unhappiness. She testified — and her husband did not refute — that he had withdrawn from her emotionally and physically. He often found fault with her and he was having trouble sleeping, as a result of which he would take sleeping pills and tranquilizers until he passed out. Believing he was again exhibiting a pattern of addictive behavior, she tried unsuccessfully to persuade him to enter treatment. By the end of 1998, his distancing from her was such that he no longer had a sexual desire CT Page 3132-bq for her. She related that, when she asked him why that was so, his response was, "You're too fat and ugly to f---." That testimony went unrefuted as well.
He was by then earning almost a million dollars yearly from his employment and he was spending generous sums. Having had an interest in music since before the marriage and owning a large collection of albums, he replaced seven to eight hundred albums with cds, spent approximately $23,000.00 on stereo equipment, was spending significant amounts on concert and theater tickets (which events he attended without the plaintiff), and she stated he spent approximately $50,000 on the Maserati. He also spent serious money on the purchase of several special guitars. He had additionally become heavily involved in stock trading and, without his wife's knowledge, he had invested assets (specifically, $100,000+ of Connecticut municipal bonds) which they years earlier had agreed would remain free from risk so as to remain their retirement "safe harbor." Her testimony was that the $1.4 million he earlier had in an account at Goldman Sachs had, by June of 1999, dwindled to $285,000.
His firing by Omega in late 1998 led to more frenetic trading. He remained out of work until some time after September of 1999 when he and another started a financial services company called Kismet Capital. Following his firing by Omega, he began spending a lot of time with his next door neighbors both during the day while the plaintiff was at work in New York City and during prolonged evening hours. She stated he would sometimes leave home in the early evening to play tennis with the female neighbor — herself still married — or to take her for a ride on his motorcycle and not return home until early morning. By the spring of 1999, the defendant and his neighbor were spending every evening together; in fact, the plaintiff found the neighbor's clothing in the house on one occasion. At trial, the defendant admitted — as he had in deposition testimony on March 31, 2000 — that he had a sexual relationship with the neighbor — one which he said began in late 1998.
When Kismet Capital was begun, the defendant wanted to take a mortgage on the marital property[1]; having by then learned her husband had invested their retirement assets and that he had lost virtually all he had invested as a result of risky trading practices,[2] the plaintiff would not agree to taking a mortgage on the property. The plaintiff did, however, loan him $235,000; he gave her a promissory note in that amount and the note was secured by a mortgage deed on his interest in the marital property in Fairfield (See Plaintiff's Exhibit H). The mortgage deed was recorded on the Fairfield land CT Page 3132-br records (Plaintiff's Exhibit G); the note has never been paid.
To be sure, the plaintiff was also spending significant amounts as a result of their newly acquired wealth. Most of what she spent, however, was spent not on things bought solely for her own pleasure or amusement; the evidence was that, in late 1997 through the spring of 1998, approximately $90,000.00 was spent on house renovations and furnishings.
The defendant moved out of the marital bedroom in February of 1999, and, by July of 1999, incidents of physical and emotional abuse increased. Both at trial and in an affidavit in support of a restraining order for which she applied on July 16, 1999, the plaintiff related an incident of July 8, 1999, when the defendant said to her, "How about if I get a f------ gun and disintegrated your f------ brain?" In the same affidavit and again at trial, she asserted that, on July 14, 1999, her husband again became enraged, grabbed her by the hair, jerked her around violently, and slammed her head into the metal arm of a treadmill; she stated he hit a mirror with his fist, kicked a television set, and proceeded, in the wife's presence, to defecate on a rug. The defendant didn't deny the latter at trial; rather, he testified the defecation occurred because he "lost control." The restraining order was issued and the defendant was forbidden to return to the marital premises. Since August of 1999, he has been renting a place in Weston, paying rent of $4,000/month.
In 1999, the defendant had employment income of $525,070.88 (Plaintiff's Exhibit J). In May of 2000, he accepted a position as Managing Director of Risk Arbitrage at TD Securities (USA), Inc. in New York. His employment contract (Plaintiff's Exhibit K) provides for a base salary of $150,000 ($12,500/mo.), a $25,000 signing bonus, and a bonus of $337,000 paid in December of 2000; he earned at least $425,000 from that company in 2000. The same contract provides for a discretionary bonus of $337,500 payable by June, 2000, if, over the first year of employment, the defendant continued to have "a trading book of U.S. $100mm long positions generating a Return on Capital of 15%." The defendant's position at trial was that it was speculation to assume this second bonus of $337,500 would be forthcoming. The court rejects this suggestion. The defendant offered no evidence his performance for the period December, 2000, to June, 2001, was less than satisfactory or that he had been advised the bonus was uncertain. No evidence was proffered to suggest the present value of his trading book would not qualify him for the bonus. of interest is that if, over the past year, his trading book generated a return of capital in excess of 17 1/2%, his bonus will be $431,250 and, if his trading book generated a return of capital in excess of 20% over CT Page 3132-bs the same period, his bonus will be $525,000. Regarding the $337,500 bonus paid in December of 2000, by agreement of the parties made an order of the court, $128,250 was used to pay federal and state taxes, $140,000 was used to repay a margin call on stock purchases the defendant made, $30,000 was used to pay a bank overdraft, $14,000 the defendant used to pay his credit card debt, $7,000 was paid in medical bills (his), $5,000 went to pay a portion of his legal fees in this action, and the remaining sum of $13,250 continues to be held in an interest bearing escrow account pending the parties' further agreement or court order.
Some time after the defendant's removal from the marital premises, the plaintiff discovered in the home photographs the defendant had taken of various prostitutes. Some were taken of women hired on trips he took abroad; others, however, were of a prostitute photographed during the marriage on the marital bed and elsewhere in the marital bedroom (Plaintiff's Exhibit P). The latter photographs are salacious in nature. After he moved out of the home, it was learned the defendant had given his next door neighbor gifts and that he had loaned her and her husband money since re-paid to the defendant (Plaintiff's Exhibit M, pp. 29-31).
The defendant presently suffers from peripheral neuropathy, a primarily sensory degeneration of the spinal cord marked by such symptomatology as imbalance, limb weakness, broad-based gait, etc. At trial, he exhibited a severely impaired ability to walk and an apparent lack of balance. He ambulated with the aid of a walker. He can no longer drive[3] nor can he any longer master train or subway travel. His treating neurologist, Dr. Harriet Kotsoris, testified his neuropathy[4] and demonstrated Vitamin B-12 deficiency was consistent with the history he gave her of ingesting nitrous oxide (N2O), an inhalational anesthetic consumed because of its euphoriant properties — thus, its common moniker of "laughing gas." Dr. Kotsoris testified she last saw the defendant in December, 2000, and, because he appeared then to be making a recovery and did not state he was still continuing to inhale N2O, she felt in fact he had discontinued the habit. His February, 2001, testimony was, however, that he had last used the toxin in January, 2001. Though he denied Dr. Kotsoris had ever told him the cause of his neurologic symptoms was his recreational use of the inhalant together with a B-12 deficiency,[5]
the doctor clearly stated she did tell him and that a finding by MRI of a lesion on the right side of the brain had nothing to do with his current problem and was more likely scar tissue resulting from chronic infection. The extent of the defendant's addiction to nitrous oxide — which "addiction" the defendant denies though he does admit to having an addictive personality — is made clear by his spending of $9,000 for "whipped cream chargers"[6] beginning in December of 1999 (See e.g. CT Page 3132-bt Plaintiff's N — an invoice from Leland Limited, Inc. in response to the defendant's order by telephone of the item.). Twenty-four (24) cylinders — or cartridges per pack and twenty-five (25) boxes per carton were shipped to the husband's Weston address. The defendant described his placing of the cartridges in the mouth and pressing down so as to release the nitrous oxide; his testimony was that this routine was characteristically performed over a period of five to six (5-6) continuous hours. The chronology of the defendant's abuse of nitrous oxide and the correlation of that use to his increasingly debilitating symptoms underscores his neurologist's opinion his present medical condition is as a result of his voluntary consumption of laughing gas. Relevant to this court's findings and orders is Dr. Kotsoris' opinion that, were the defendant to stop using nitrous oxide, she would not only expect no further neurological damage but that the prognosis would be for a good recovery[7]. The implications of his discontinuance of nitrous oxide with regard to his continued employability and his financial security are obvious.
The plaintiff testified the cause of the breakdown of the marriage was the husband's distancing of himself both physically and emotionally. The defendant testified the cause of the breakdown was the plaintiff's increasing criticism of him and her smoking in the home[8]. His response to her smoking is in striking contrast to her response to his alcoholism and his earlier dependence on sleeping pills and tranquilizers. As opposed to her supportive care-taking, his focus is on the threat of second hand smoke to his own health, a fear undermined by his subsequent use of an anesthetic he introduced directly into his lungs. The court finds the cause of the breakdown was the stress imposed by the husband's adulterous affair with his neighbor, his lack of need for the physical and emotional intimacies which characterize a healthy marital relationship, and his reckless handling of marital funds so as to deprive the plaintiff of retirement assets for which they had planned and so as to seriously jeopardize the financial integrity of the marital unit.
In formulating proper orders in this case, the court must consider the factors set forth in §§ 46b-81 and 46b-82 together with the provisions of § 46b-62 regarding attorney's fees. The court has considered all of these factors in making its determinations and has considered all of the evidence, the parties' demeanor and credibility, their financial affidavits, claims for relief, and the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account,"Scherr v. Scherr, 183 Conn. 366, 368 (1981), this court will not recount CT Page 3132-bu the statutory criteria and the evidence other than has been previously stated. "The court is not obligated to make express findings on each of these statutory criteria." Weiman v. Weiman, 188 Conn. 232, 234 (1982). The court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding. Lee v. Lee,197 Conn. 1, 5 (1985). It need not give equal weight to each factor.Kane v. Parry, 24 Conn. App. 307, 313-14 (1991). Our alimony statute does not recognize an absolute right to alimony. C.G.S. § 46b-82; Thomasv. Thomas, 159 Conn. 477, 487 (1970). "The primary basis for the award of alimony has been not to punish . . . but to continue the duty to support the other . . ." Toby v. Toby, 165 Conn. 742, 748 (1974). In making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. The purpose of property division "is to unscramble the ownership of property, giving to each spouse what is equitably his." McPhee v. McPhee, 186 Conn. 167, 170 (1982) (citations omitted). At the time of decree, the trial court may assign to either party all or any part of the estate of another. Id. In fixing the nature and value of the property assigned, and in determining whether alimony should be awarded, the court must also consider the liabilities and needs of the parties, "the opportunity of each for future acquisition of capital assets and income," and "the contribution of each . . . in the acquisition, preservation or appreciation in value of their respective estates." C.G.S. § 46b-81 (c); Elliott v. Elliott 14 Conn. App. 541,546 (1988). The statute gives no priority to any single criterion in determining a property division. McPhee, at 172 (citations omitted). In this regard, however, it is instructive that the defendant has virtually unlimited earning potential[9] whereas the plaintiff has only a modest increase in salary yearly[10]. Though at present the plaintiff enjoys better health than does the defendant, the only medical opinion proffered at trial was that the defendant's prospects for a good recovery from his present neurological problems are real and dependent only upon his discontinuance of nitrous oxide. None of the medical articles submitted as evidence, deemed authoritative by Dr. Kotsoris and examined by the court, suggest in-patient treatment is required to accomplish that discontinuance and there is therefore no reason to believe an interruption of employment is required.
The court, in addition to the foregoing findings, finds as follows:
1. There is the requisite jurisdiction.
2. The allegations of the complaint have been proved and are true. CT Page 3132-bv
3. There has been an irretrievable breakdown of the marriage.
 4. The defendant is at fault for the breakdown of the marriage.
The court enters the following orders:
 1. The defendant shall assign all of his right, title and interest in and to the real property at 3233 North Street in Fairfield, Connecticut, to the plaintiff. She shall thereafter be wholly responsible for all expenses in connection with that property and shall indemnify and save harmless the defendant with regard thereto.
 2. The defendant shall be entitled to the mortgage interest (if applicable) and the real estate tax deductions on the marital property for the year 2000.
3. Neither party shall pay to the other any amount in alimony.
 4. In consideration of the defendant's transfer of his interest in the marital premises to the plaintiff, the plaintiff shall release the defendant from any liability on the mortgage note executed in her favor in the amount of $235,000.
 5. The plaintiff shall retain as hers, free of any claim or demand by the defendant, the following assets:
a. Her 1996 Audi A6;
b. Her First Union and Citibank checking accounts;
 c. Her stocks, bonds, and mutual funds comprising the Suretrade brokerage account;
d. Her 401K; and CT Page 3132-bw
e. Her IRA.
She shall be solely responsible for the following debts and indemnify and save harmless the defendant regarding the same:
a. The First Union loan for taxes and debts;
b. The loan from her mother; and
c. The credit card debt incurred for legal fees.
 6. The defendant shall retain as his, free of any claim or demand by the plaintiff, the following assets:
 a. The 1979 Maserati, 1999 Volvo, 1993 Jeep Grand Cherokee, and 1972 Honda motorcycle;
 b. The First Union CAP account and resource checking account;
 c. The stocks, bonds and mutual funds in the Bull 
Bear account #485-01250 and the J.D. Waterhouse account #33000098;
d. His William Penn life insurance policy on his life;
e. His TD 401K, TD IRA, and TD IRA rollover accounts;
 f. All personal property already removed from the marital premises and listed in two (2) schedules offered as evidence at trial;
g. Any and all interest in Kismet Capital; and
h. Any and all interest in any future employment bonus.
He shall be solely responsible for the following debts and save harmless the defendant regarding the same:
 a. The debt owed MBNA Visa and described on his 1/29/01 financial affidavit as "overdraft"; and
 b. The IRS debt for joint back taxes interest, and CT Page 3132-bx penalties as identified on the financial affidavit above described.
7. The plaintiff shall retain as hers the family dogs.
 8. With regard to tangible personal property yet remaining in the marital property, the parties shall divide the same as they may agree. Any dispute arising with regard to the same shall be submitted to the Family Services Division of this court for mediation and, failing successful mediation, this court shall resolve all remaining disputes upon motion by either party.
 9. The defendant shall pay whatever sum remains from his first bonus payment of $337,500 in an interest bearing escrow account and add to that the sum necessary to equal $30,000. that $30,000 to be paid within thirty (30) days of this date toward the plaintiff's counsel fees.
SO ORDERED this 26th day of February, 2001.
SHEEDY, J.